**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |
|---|---|
| BORIS SHMARUK, individually and in his capacity as g/a/l for Child J.S., | No. 23-cv-22609 (MEF)(JRA) |
| *Plaintiff*, | **OPINION and ORDER** |
| v. | |
| LIBERTY MUTUAL INSURANCE COMPANY and CVS CAREMARK, | |
| *Defendants*. | |

---

\*    \*    \*

For purposes of this Opinion and Order, the Court largely assumes familiarity with the facts and procedural history of this case.

\*    \*    \*

Some background:

A 12-year-old boy[1] was prescribed growth-hormone medication[2] by an advanced practice nurse. See Defendants' Statement of Material Facts Not in Dispute ("Defendants' SOF") (ECF 56-1) ¶ 19; Plaintiff's Response to Defendants' Statement of Material Facts ("Plaintiff's SOF") (ECF 63-3) ¶ 19; Declaration of Allison Johansson, Exhibit A ("Administrative Record") (ECF 57) at 309.[3]

---

[1]  Identified in the parties' legal papers by his initials, J.S.

[2]  Norditropin.

[3]  The full administrative record is at ECF 57.  The administrative record has Bates-numbered pages, and citations to

The boy's guardian[4] sought payment for the medicine through his (the guardian's) workplace employee-benefits plan.  See Defendants' SOF ¶¶ 1-2, 18-19; Plaintiff's SOF ¶¶ 1-2, 18-19.

The application was denied.  See Defendants' SOF ¶¶ 20, 26, 32, 43-44, 47; Plaintiff's SOF ¶¶ 20, 26, 32, 43-44, 47.

To see why, take a small step back.

Under the referenced employee-benefits plan, when someone puts in a claim for coverage of growth-hormone medication, the claim is assessed using a particular set of guidelines.  See Defendants' SOF ¶ 10; Plaintiff's SOF ¶ 10.[5]

The guidelines lay out a structured set of eligibility criteria for determining whether treatment is medically necessary under the employee-benefits plan.

The guidelines require working through that criteria in a prescribed order.  Step by step, as in a decision tree.  At each step, there is a question.  And most of the questions are yes/no.

When the answer is "yes," the reviewer is generally directed to keep going, to move on to the next question.  But when the answer is "no," the reviewer is typically told that that is the end of the line; coverage should be denied.

Here, coverage was denied at question 119 of the guidelines. See Defendants' SOF ¶¶ 20-21, 27, 29, 34; Plaintiff's SOF ¶¶ 20-21, 27, 29, 34; Guidelines at 10.

Question 119 asks:

> Does the patient have a pretreatment 1-year height velocity[6] of greater than 2 standard deviations (SD) below the mean for age and gender?

---

the record in this Opinion and Order use that Bates-numbering, with leading zeros omitted.

[4]  Boris Shmaruk.

[5]  The guidelines are found in the administrative record between pages 1238 and 1271.  For ease of reference, the Court will cite to the numbered pages of the guidelines, 1 through 34, rather than to the Bates-numbered pages in the administrative record.

[6]  Height velocity is about the pace of growth --- the change in a person's height over a given period of time.  See Evan G.

2

Guidelines at 10; see also Defendants' SOF ¶ 12; Plaintiff's SOF ¶ 12.

If the answer is "yes," then the person reviewing the claim is directed to move on and take up the next question.  See Guidelines at 10.

If the answer is "no," the reviewer is directed to deny coverage.  See id.

Here, the answer to question 119 was "no," so that was it --- coverage was denied.  See Defendants' SOF ¶¶ 20-21, 26-27, 31-34, 43-44, 46; Plaintiff's SOF ¶¶ 20-21, 26-27, 31-34, 43-44, 46.

*     *     *

In a nutshell: a boy's guardian sought insurance coverage for growth hormone medication via his (the guardian's) employee-benefits plan, and the application was denied; the stated reason was that the answer to question 119 of the relevant guidelines was "no."

*     *     *

In light of the above, the guardian[7] filed this lawsuit.  See Amended Complaint ("Complaint") (ECF 32).  From here, he is called "the Plaintiff."

The lawsuit runs against two entities: (i) the insurance company that sponsors the employee-benefits plan,[8] and (ii) the company that evaluates claims for prescription drugs under the plan.[9] From here, these two entities are called "the Defendants."

The Plaintiff's allegation: by denying insurance coverage for the boy's growth hormone medication, the Defendants violated the Employee Retirement Income Security Act ("ERISA").  See Amended

---

Graber, Physical Growth of Infants and Children, MSD Manual Professional Version (Apr. 2025), https://www.msdmanuals.com/professional/pediatrics/growth-and-development/physical-growth-of-infants-and-children.

[7]  Recall: Boris Shmaruk.

[8]  Liberty Mutual Group Inc.  See Defendants' SOF at 1 (correcting the name used by the Plaintiff in the case caption).

[9]  CaremarkPCS Health, LLC.  See Defendants' SOF at 1 (correcting the name used in the caption).

Complaint ("Complaint") (ECF 32) ¶¶ 47-52 (citing 29 U.S.C. § 1132(a)(1)(B)).

                        *    *    *

The Defendants now move for summary judgment, arguing that they cannot be made to cover the cost of the growth-hormone prescription.  See Memorandum of Law in Support of Motion for Summary Judgment ("Defendants' Brief") (ECF 56-2) at 1-2.

The Plaintiff opposes the motion.

He argues: question 119 was answered "no," but the right answer was "yes" --- and with a "yes," everything else would have clicked into place, and the insurance claim would have been approved.  See Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Brief") (ECF 63) at 11-12.

The basis of the Plaintiff's argument:

Question 119 required the boy to "have a pretreatment 1-year height velocity of greater than 2 standard deviations (SD) below the mean for age and gender."  Guidelines at 10.  And that is what he had.  Alongside the September 2022 claim for insurance coverage, the boy's nurse submitted a medical record from February 2022.  See Administrative Record at 307-10, 726-32.  The February 2022 record reflects "pretreatment" conditions, because it was created before any growth hormone had been administered.  See Defendants' SOF ¶ 52; Plaintiff's SOF ¶ 52.  And citing the February 2022 medical record, the Plaintiff suggests[10] that for the "1-year" before February 2022, the boy's "height velocity" was "greater than 2 standard deviations (SD) below the mean for age and gender."  See Plaintiff's Brief at 11-12.[11]

---

[10]  But does not say.  See footnote 11.

[11]  The Plaintiff does not explicitly argue that the boy's height velocity for February 2021 to February 2022 was "greater than 2 standard deviations (SD) below the mean for age and gender." Guidelines at 10; see Plaintiff's Brief at 12.  Rather, the Plaintiff contends that the boy's February 2021 to February 2022 "growth velocity of 3.7cm placed him at the -2 [standard deviations] mark."  Plaintiff's Brief at 12 (emphasis added).  This could mean that the boy's height velocity was exactly two standard deviations below the mean.  But it could also be

4

intended to mean that the boy's height velocity fell below that mark --- and thus that his height velocity was, as required, "greater" than two standard deviations under the mean.

The parties have not provided an easy way to work through these possibilities.

No material in the administrative record has been brought to the Court's attention that indicates (i) the mean growth velocity for a boy of the relevant age, or (ii) the velocities that sit two standard deviations below that mean.

Moreover, it is not clear how the Court should understand the "3.7 cm/yr" number put forth by the Plaintiff. See id. The pages cited to by the Plaintiff do not reference this figure. See id.; Administrative Record at 1201 (noting a growth velocity of 4.6 cm/yr); id. at 1191 (noting a growth velocity of 6.4 cm/yr); id. at 1048-50 (graphing the boy's stature and weight over time, but not the boy's height velocity).

To be sure, the 3.7 number may refer to a medical record submitted by the boy's nurse from February 2022. See Administrative Record at 1195. But this record describes the 3.7 number as an "[i]nterval growth rate" rather than an annual one. Id. at 1198 (emphasis added). And this difference may matter. An interval growth rate may, in some contexts, describe a patient's rate of change in height as calculated from the patient's last appointment --- not over the course of a full year, as required by question 119. See, e.g., Aloka L Patel, MD et al., Calculating Postnatal Growth Velocity in Very Low Birth Weight (VLBW)Premature Infants, 29(9) J. Perinatol. 618, 621 (2009) (describing growth velocities calculated over chosen time intervals like from a baby's "day of birth to NICU discharge, and from day of regaining BW to NICU discharge"); see also Interval, Taber's Medical Dictionary, https://www.tabers.com/tabersonline/view/Tabers-Dictionary/743747/all/interval (last visited Feb. 11, 2026) (describing an interval as the "time between [any] two . . . periods").

In addition, the medical records submitted alongside the claim for coverage are difficult to understand without the benefit of real explanation. For example, the "[i]nterval growth rate[s]" recorded at the boy's appointments with his nurse do not line up with the growth velocities plotted in the chart that purports to show changes in the boy's growth velocity over time. Compare Administrative Record at 319, 324, 330, 335, 340, 348, 352, 356, with id. at 363. And while the Plaintiff argues that the relevant growth velocity is 3.7 cm/yr, see Plaintiff's Brief at

5

For their part, the Defendants contend that the Plaintiff has it wrong.

Question 119, as noted, requires the boy to have "a pretreatment 1-year height velocity of greater than 2 standard deviations (SD) below the mean for age and gender."  Guidelines at 10.  But not for <u>any</u> 1-year period --- for the 1-year <u>immediately before</u> the boy started growth-hormone treatment.  <u>See</u> Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Defendants' Reply Brief") (ECF 67) at 5-6.  For an <u>earlier</u> time period --- between February 2021 and February 2022, for instance --- the boy may possibly have had a slow-enough growth rate.[12]  But the Defendants argue that would not count in any event.  What matters is the boy's growth rate between October 2021 and October 2022 --- that is, during the 1-year run-up to the moment when he began growth-hormone treatment.  <u>See</u> <u>id</u>.  And for <u>that</u> period, the records submitted by the Plaintiff do not show a "height velocity of greater than 2 standard deviations (SD) below the mean for age and gender." Guidelines at 10.

*    *    *

To boil it down, the Plaintiff argues that to qualify for coverage under the guidelines the boy needed an especially slow growth rate over any 1-year period of his life, while the Defendants contend that the boy needed an especially slow growth

---

12, the boy's nurse wrote a letter to the Defendants indicating that the relevant rate was 4.0 cm/yr, <u>see</u> Administrative Record at 395, before changing course and identifying the relevant rate as 4.88 cm/yr.  <u>See</u> <u>id</u>. at 595.

The complexities laid out in this footnote might support or refute the Defendants' denial of coverage.  Hard to say.  But one way pr another, the relevant issues are not meaningfully discussed by the parties in their briefs.  (And note that the Plaintiff's self-made chart, <u>see</u> Declaration of Howard M. Gurock, Esq., Exhibit 1 (ECF 63-2), does not clarify things --- and may not, in any event, be the sort of thing the Court can consider here.  <u>See</u> <u>Kosiba</u> v. <u>Merck & Co.</u>, 384 F.3d 58, 67 n.5 (3d Cir. 2004) ("[W]e have held that, in general, the record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and [it] cannot be supplemented during litigation.")).

[12]  Though the Defendants do not concede this.

6

rate in the 1-year period just before he began taking growth-hormone medication.

*    *    *

Out of the gate, the Plaintiff seems to have the better of this back-and-forth.

Question 119 asks whether the patient has "a pretreatment 1-year height velocity of greater than 2 standard deviations (SD) below the mean for age and gender."  Guidelines at 10.

A modifier (like "1-year") generally comes just before the word it modifies.  This is everyday English.[13]  He is popping over to the store to buy four eggs; "four" before "eggs," not the other way around.  She is taking a three-hour test --- and there is no missing that it is "three-hour" that modifies "test."  See Bryan A. Garner, Garner's Modern English Usage 858 (5th ed. 2022) ("in English, adjectives . . . almost invariably precede the nouns they modify").

This implies that in the phrase "pretreatment 1-year height velocity," "1-year" modifies "height velocity."  The modifier (1-year) directly precedes the modified noun (height velocity) and indicates the period of time (1-year) over which height velocity will be measured.  (And the measurement is to be taken "pretreatment" --- during an unspecified period before the start of growth-hormone treatment)

All of this seems logical, and it is how the Plaintiff understands things.

The boy needed to have a certain height velocity over the course of 1 year to meet the requirements of question 119.  But question 119 says only that the 1-year period needs to be before treatment got started --- it says nothing else about when, in

---

[13]  In the ERISA context, the plain meaning of the governing plan document looms large.  See, e.g., Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 520 (3d Cir. 1997) ("The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself. A plan administrator may have discretion when interpreting the terms of the plan; however, the interpretation may not controvert the plain language of the document."); Moench v. Robertson, 62 F.3d 533, 566-67 (3d Cir. 1995), overruled in part on other grounds by Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409 (2014).

particular, the 1-year period needs to fall.  This implies that in answering question 119, the February 2021 to February 2022 time frame should have been considered --- even though that period included measurements from more than a year before growth-hormone treatment began in October 2022.[14]

But as noted, the Defendants see things differently.

They seem to read "1-year" as modifying the term that comes before it --- "pretreatment."  Guidelines at 10.  Question 119, per the Defendants, requires a focus on the immediate 12-month lead-in to treatment --- the "1-year" "pretreatment" period. Id.

But if that were what question 119 means, then the modifier ("1-year") would have to run backwards, to cover the word before it ("pretreatment").  That sort of doubling back can sometimes happen.  But only rarely.[15]  And the Defendants have offered no reason to think that is what is happening here.

*   *   *

As to the points sketched out above, there may be real counterarguments.[16]

---

[14]  The Plaintiff's read may also work better with what guidelines reviewers are told to say to claimants who do not clear the question 119 hurdle.  See Guidelines at 10 ("Current plan approved criteria does not allow coverage of growth hormone for pediatric growth hormone deficiency . . . unless the height growth speed in one year is more than 2 standard deviation below the average for age and gender before starting growth hormone.") (emphasis added).

[15]  Some adjectives are "[p]ostpositive," Garner, Modern English Usage, at 858, meaning they "follow the nouns they modify."  Id. But adjectives that work this way are mainly holdovers, "largely . . . a remnant of the Norman French influence during the Middle Ages" and limited to certain specific phrases.  Id.  Think "accounts payable," "attorney general," "condition precedent," or "steak tartare."  Id.

[16]  For example, on the Plaintiff's read, "pretreatment" and "1-year" each modify "growth velocity" in a distinct and independent way.  The growth velocity period must take place at a certain time (pretreatment) and over a certain period (1-year).  Because on this read from the Plaintiff "pretreatment" and "1-year" operate in a wholly separate way from each other,

8

But none of the relevant linguistic issues have been meaningfully taken up by the parties to this point.

And in any event, grammar is no be-all-and-end-all.

First, a document (like the guidelines) throws off any number of clues to its meaning.  Small words choices matter, yes.  But so do broader considerations.  See, e.g., Leckey v. Stefano, 501 F.3d 212, 220 (3d Cir. 2007) (looking to overall "context" in interpreting an ERISA plan).

Second, and more fundamentally, the governing documents here give the claims administrator (one of the Defendants[17]), "the discretionary authority to construe the terms of the Plan."[18]

---

they would typically be said to work as coordinate adjectives. See Richard Nordquist, Cumulative Adjectives: Definition and Examples, Thought Co. (Nov. 5, 2019) https://www.thoughtco.com/what-is-cumulative-adjectives-1689815 (Nov. 5, 2019).  But coordinate adjectives are usually separated "by commas or an 'and.'"  Id.  Here, though, they are not.

That may suggest that "pretreatment" and "1-year" instead work with each other, to together point to the 12-month period just before treatment began, which could make "pretreatment" and "1-year" cumulative adjectives.  See id.; Danielle McLeod, Coordinate and Cumulative Adjectives, https://grammarist.com/grammar/coordinate-and-cumulative-adjectives/ (last visited Feb. 12, 2026) ("Cumulative adjectives modify a noun by building meaning.").  And cumulative adjectives are usually not separated by commas.  See Nordquist, Cumulative Adjectives; but cf. McLeod, Coordinate and Cumulative Adjectives, Grammarist(stating that cumulative adjectives "must be placed in a specific order to convey the meaning of the sentence"); Garner, Modern English Usage, at 24 (stating that coordinate adjectives that are related are usually separated by commas, while those that are unrelated are not).

[17]  CaremarkPCS Health, LLC.

[18]  Here, what is being interpreted is a set of guidelines.  The parties' briefing suggests that the guidelines should be treated as an integral part of the plan.  This accords with how several courts of appeals have approached guidelines in similar contexts.  See, e.g., Brogan v. Holland, 105 F.3d 158, 162 (4th Cir. 1997) ("The Plan also binds all persons claiming benefits under the Plan to these interpretive guidelines, known as 'Q & As.'  We afford the Trustees' interpretation of these rules the same deference that we give the Trustees' interpretation of the

9

Declaration of Soo Y. Kim, Exhibit C ("Summary Plan Description") (ECF 56-7) at 16.

And when an ERISA plan does that, courts must review the administrator's denial of benefits under a deferential "arbitrary and capricious" standard.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114-15 (1989); Conkright v. Frommert, 559 U.S. 506, 512 (2010) (explaining that when Firestone deference applies, the plan administrator's interpretation of the plan "will not be disturbed if reasonable") (cleaned up).

Under that standard, the question is not whether the administrator's reading of the plan[19] is the best one, but rather whether it is a reasonable one.  See Vitale v. Latrobe Area Hosp., 420 F.3d 278, 286 (3d Cir. 2005); Martorana v. Bd. of Trs. of Steamfitters Local Union 420 Health, Welfare & Pension Fund, 404 F.3d 797, 801 (3d Cir. 2005); Mullins v. Consol Energy, Inc. Long Term Disability Plan, 110 F.4th 180, 185-86 (3d Cir. 2024); see also Fleisher v. Standard Ins. Co., 679 F.3d 116, 121 (3d Cir. 2012) ("When a plan's language is ambiguous and the administrator is authorized to interpret it, courts 'must defer to this interpretation unless it is arbitrary or capricious.'") (quoting McElroy v. SmithKline Beecham Health & Welfare Benefits Tr. Plan, 340 F.3d 139, 143 (3d Cir. 2003).

In deciding whether an interpretation is reasonable, a court ranges out beyond the governing language.  See Moench v. Robertson, 62 F.3d 553, 556 (3d Cir. 1995) (discussing five "helpful factors to consider in determining whether an interpretation of a plan is reasonable").

---

language of the Plan itself.") (citing Lockhart v. United Mine Workers of Am. 1974 Pension Tr., 5 F.3d 74, 78 n.6 (4th Cir. 1993)); Gordon v. ILWU-PMA Benefit Funds, 616 F.2d 433, 438-39 (9th Cir. 1980) (applying an arbitrary and capricious standard of review to trustees' interpretation of rules adopted by the trustees under the plan); Miniard v. Lewis, 387 F.2d 864, 865 (D.C. Cir. 1976) (similar), cert. denied, 393 U.S. 873 (1968)); see also Diaz v. Seafarers Int'l Union, 13 F.3d 454, 457 (1st Cir. 1994).

[19]  See footnote 18.

For example, a court can ask: how consistently has the claims administrator pressed the interpretation it now advances?  See Moench, 62 F.3d at 566.[20]

A court can also ask[21] whether a proposed reading of a certain part of the plan render other parts of the plan redundant, internally inconsistent, or illogical in some way.  See id. at 566-67 (undertaking this sort of analysis in the ERISA-plan context).[22]

---

[20]  The parties' briefing does not address this, even though there is reason to believe that the Defendants' growth velocity calculations have been inconsistent.  Compare Administrative Record at 274, with id. at 572, and id. at 259.  Indeed, the parties offer no arguments about external consistency (that is, consistency between the Defendants' interpretation of question 119 here and in other cases), or internal consistency (that is, consistency between the Defendants' interpretation of question 119 and similar language in other questions).  For cases that look to external consistency, see, for example, Mallon v. Tr. Co. of N.J. Severance Pay Plan, 2006 WL 8450747, at *7 (D.N.J. Dec. 12, 2006), and Pokol v. E.I. du Pont de Nemours & Co., Inc., 963 F. Supp. 1361, 1377 (D.N.J. 1997).  But cf. Metro. Life Ins. v. Potter, 992 F. Supp. 717, 726 (D.N.J. 1998) (stating that the Third Circuit has held that "past practice in interpreting plan provisions is of no significance where the plan language is clear") (citing Epright v. Envt'l Res. Mgmt., Inc., 81 F.3d 335, 339 (3d Cir. 1996)).  For cases that look to internal consistency, see, for example, McCall v. Metro. Life Ins. Co., 956 F. Supp. 1172, 1183 (D.N.J. 1996); Kaul Sanjeev MD FAS, LLC v. N. N.J. Teamsters Benefit Plan, 2018 WL 3019883, at *6 (D.N.J. June 18, 2018); and Nevins v. Prudential Ins. Co. of Am., 974 F. Supp. 400, 405 (D.N.J. 1997).

[21]  Among other things.

[22]  In, say, a bread-and-butter commercial context, judges typically have some relevant experience to draw on.  So a court may be able to work through a contract and readily decide whether one reading of a particular clause makes sense in light of the broader business relationship fixed in place by the contract.  But that is not this case.  Would the Plaintiff's reading of question 119 be logically inconsistent with another question in the guidelines?  Would the Defendant's reading render certain things in the guidelines superfluous or put a guidelines question at odds with the basic scientific logic of human growth or of growth-hormone treatment?  Answering these

                              *      *      *

As sketched out above, there are gaps in the parties' briefing that make it difficult to reliably decide the pending motion. Basic factual matters, see footnote 11, are hard to follow, and key legal arguments (as to language, but also beyond that) are gestured at or assumed, but not meaningfully developed.  The Court can seek to resolve the relevant issues on its own.  But the better way forward is to get the benefit of the parties' considered views.

Accordingly, the Court will require additional briefing from the parties that specifically zeroes in on the issues that have been laid out in this Opinion and Order.  A schedule for this briefing will be set by the United States Magistrate Judge.

                              *      *      *

Before concluding, a final note.

The Plaintiff argues that the guidelines are, themselves, arbitrary and capricious.

Specifically, he challenges the idea "that growth hormone is only appropriate for children over 2.5 years of age who have, in a one-year period, a pre-treatment height velocity less two standard deviation scores ('-2SDS') below the mean," Plaintiff's Brief at 3 --- and suggests that because a non-profit reported that growth-hormone medication would have been considered medically necessary for the child under a different set of guidelines, the Defendants should have landed on that same conclusion here.  See id. at 5-7, 15-16.

But this does not hold up.

The Plaintiff's employee-benefits plan covers "Medically Necessary" treatment, Administrative Record at 130 --- but the plan also states that "Medically Necessary" services are "health care services that [meet certain criteria] as determined by the Claims Administrator or its designee, within the Claims Administrator's sole discretion."  Id. at 136 (emphasis added). And per the plan, it is for claims administrator,[23] in its "sole

_____

sorts of questions (and others like them) may well require medical and diagnostic knowledge that the Court simply does not have.  It is for the parties to supply it.

[23]  CaremarkPCS Health, LLC.

                                    12

discretion," to "develop[] and maintain[] clinical policies that describe the Generally Accepted Standards of Medical Practice" used to "support[] its determinations regarding [coverage of] specific services."  Id. at 137 (cleaned up).

Here, the claims administrator has exercised its discretion by putting out the guidelines that have been discussed throughout this Opinion and Order.

Section 502(a)(1)(B) of ERISA authorizes plan participants and beneficiaries to sue "to recover benefits due . . . under the terms of the plan" or "enforce [their] rights under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B) (emphases added).

So the key question before the Court is whether the claims administrator[24] properly administered the plan[25] in accord with the plan's terms.  See Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108 (2013) (stating that the "focus" of ERISA is "on the written terms of the plan"); US Airways, Inc. v. McCutchen, 569 U.S. 88, 101 (2013) ("The plan, in short, is at the center of ERISA."); Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833 (2003) ("[E]mployers have large leeway to design . . . welfare plans as they see fit."); see also Wit v. United Behav. Health, 79 F.4th 1068, 1087 (9th Cir. 2023) (concluding that the question under Section 502(a) is not whether a plan's terms are consistent with generally accepted standards of care, "but whether [the claims administrator] properly administered the Plans pursuant to the Plan terms").

Indeed, "[t]he statutory language speaks of enforcing the terms of the plan, not of changing them" or assessing their substance. CIGNA Corp. v. Amara, 563 U.S. 421, 436 (2011) (finding "nothing" that "authorizes a court to alter th[e] terms" of an employee benefits plan).  This is because ERISA does not "mandate what kind of benefits employers must provide if they choose to have such a plan."  Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996).  Rather, ERISA "ensure[s] that employees will not be left empty-handed once employers have guaranteed them certain benefits."  Id.

Under Section 502(a)(1)(B), then, the Plaintiff can argue that the Defendants failed to do what the plan promised they would.

---

[24]  Recall: CaremarkPCS Health, LLC.

[25]  See footnote 18.

13

But the Plaintiff cannot win on the theory that the claims administrator-Defendant should have used different eligibility criteria in the first place.[26]

\*     \*     \*


IT IS on this 17th day of February, 2026, SO ORDERED.

_____

Michael E. Farbiarz, U.S.D.J.

---

[26] One more note.  The Plaintiff also argues that the Affordable Care Act prevented a coverage denial here because the boy had certain pre-existing conditions.  See Plaintiff's Brief at 6. But the Plaintiff points to no evidence suggesting that the Defendants denied the claim because the boy had a relevant condition before his eligibility for benefits as a plan beneficiary kicked in.  And under the Affordable Care Act, that is what is prohibited.  See 42 U.S.C. § 300gg.  Employers cannot deny coverage or charge higher premiums on the basis that participants had certain conditions before joining the plan --- but nothing requires employers to cover any and all conditions a participant or their beneficiary may have.  See Lockheed, 517 U.S. at 887